**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NIELS VOCHTEN, derivatively on behalf of REPLIMUNE GROUP, INC., | Case No.: |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| SUSHIL PATEL, EMILY HILL, PHILIP ASTLEY-SPARKE, MADHAVAN BALACHANDRAN, KAPIL DHINGRA, MICHAEL GOLLER, CHRISTY OLIGER, VELEKA R. PEEPLES-DYER, PAOLO PUCCI, JOSEPH SLATTERY, and DIETER WEINAND, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| REPLIMUNE GROUP, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Niels Vochten ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Replimune Group, Inc. ("Replimune" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Sushil Patel ("Patel"), Emily Hill ("Hill"), Philip Astley-Sparke ("Astley-Sparke"), Madhavan Balachandran ("Balachandran"), Kapil Dhingra ("Dhingra"), Michael Goller ("Goller"), Christy Oliger ("Oliger"), Veleka R. Peeples-Dyer ("Peeples-Dyer"), Paolo Pucci ("Pucci"), Joseph Slattery ("Slattery"), and Dieter Weinand ("Weinand") (collectively, the "Individual Defendants," and

1

together with Replimune, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Replimune, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against Defendants Patel and Hill for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Replimune, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Replimune's current directors and officers from November 22, 2024 through July 21, 2025, both dates inclusive (the "Relevant Period").

2.      Replimune is a biotechnology company that represents itself to be "committed to applying our leading expertise in the field of oncolytic immunotherapy to transform the lives of cancer patients through our novel oncolytic immunotherapies." The Company largely focuses on developing immunotherapies to be utilized in the treatment of cancer through oncolytic immunotherapies, i.e. genetically engineered viruses designed to selectively target and kill tumor cells while stimulating the immune system to attack tumors.

3.      Replimune's lead treatment candidate is RP1, also known as vusolimogene

oderparepvec. RP1's clinical trial is referred to as the IGNYTE Trial. The Company received a non-exclusive license to use the drug nivolumab from Bristol Myers Squibb for use in the IGNYTE Trial, to be utilized in conjunction with RP1 for the treatment of advanced melanoma.

4.     On November 21, 2024, the Company published a press release announcing the submission of a Biolgics License Application ("BLA") with the United States Food and Drug Administration ("FDA") for the approval of using RP1, in conjunction with niolumab, as a treatment for melanoma (the "BLA Press Release"). In relevant part, the BLA Press Release stated the following:

> [Replimune] today announced that it has submitted a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen. The submission was made under the Accelerated Approval pathway. The Company also announced that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting.
>
> Breakthrough Therapy designation is intended to expedite the development and review of therapies for serious diseases *when preliminary clinical evidence indicates that the therapy may provide substantial improvement over existing available therapies* on one or more clinically significant endpoints. *This Breakthrough Therapy designation is based on the safety and clinical activity observed in the anti-PD1 failed melanoma cohort of the IGNYTE clinical trial*.[1]

5.     However, in reality, the IGNYTE Trial was plagued by clinical deficiencies which prevented the FDA from being able to approve the BLA, contrary to what the Individual Defendants continuously represented throughout the Relevant Period.

6.     The truth emerged on July 22, 2025, when the Company issued a press release revealing that the FDA had sent a Complete Response Letter ("CRL") regarding the BLA (the "Response Press Release"). The Response Press Release revealed that "*the FDA is unable to*

---

[1] All emphasis has been added unless otherwise noted herein.

***approve the application in its present form***," because of issues with the IGNYTE Trial, with the CRL "***indicat[ing] that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness***."

7.    On this news, the price per share of the Company's common stock fell $9.52, or 77.2%, from a closing price of $12.32 per share on July 21, 2025, to close at a price of $2.81 per share on July 22, 2025.

8.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Replimune, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the IGNYTE Trial was not a properly-controlled study; (2) the Individual Defendants were aware of, or should have been aware of, the material issues with the IGNYTE Trial's control; (3) therefore, the IGNYTE Trial's prospects were severely overstated; and (4) as a result of the foregoing, the clinical prospects for RP1 were overstated, giving way to a high likelihood that the FDA would not approve the BLA. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.    Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, three of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of approximately $607,120.

11.    The Individual Defendants failed to correct and/or caused the Company to fail to

correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Patel's and Hill's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Replimune. Plaintiff has continuously held Replimune common stock at all relevant times.

### Nominal Defendant Replimune

20.     Replimune is a Delaware corporation with its principal executive offices at 500 Unicorn Park Drive, Suite 303, Woburn, Massachusetts 01801. Replimune's common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "REPL."

**Defendant Patel**

21.    Defendant Patel has served as the Company's CEO and as a Company director since April 2024. Defendant Patel previously served the Company in various roles starting in May 2021, most recently serving as the Company's Chief Strategy Officer from January 2023 until taking over as CEO in April 2024.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Patel made the following sales of Company stock:

| DATE | NUMBER OF SHARES SOLD | PRICE PER SHARE($) | PROCEEDS ($) |
|------|-----------------------|--------------------|--------------|
| December 16, 2024 | 10,000 | $12.42 | $124,200 |
| May 20, 2025 | 25,105 | $8.06 | $202,346 |

Thus, in total, before the fraud was exposed, he sold 35,105 shares of Company stock on inside information, for which he received approximately $326,546 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The Schedule 14A the Company filed with the SEC on July 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Patel:

> Dr. Sushil Patel has served as a member of our Board and as our Chief Executive Officer since April 2024. Previously, Dr. Patel served as our Chief Strategy Officer from January 2023 to April 2024 and as our Chief Commercial Officer from May 2021 to January 2023. Prior to joining Replimune, Dr. Patel served as VP, Franchise Head for Lung, Skin, Tumor Agnostic, and Rare Cancers at Genentech, Inc. since April 2018, and previously held various positions of increasing responsibility at Genentech, Inc. since 2002, including global launch lead and lifecycle leader for Tecentriq in lung cancer. From 1999 to 2002, Dr. Patel served as Senior Consultant at Front Line Strategic Management Consulting. From 1996

to 1999, Dr. Patel served as a Senior Research Executive at IMS Health in the Pharma Strategy Group. Prior to joining IMS Health, Dr. Patel served as the Clinical Research Scientist at the Central Public Health Laboratory from 1993 to 1996. Currently, Dr. Patel serves on the board of directors of Revolution Medicines, Inc., a NASDAQ-listed clinical-stage company developing targeted therapies for RAS-addicted cancers. Dr. Patel obtained his Ph.D. in Molecular Biology from the University of London in 1999, his M.S. in Biotechnology from the Imperial College London in 1993, and his B.S. in Microbiology and Microbial Technology from the University of Warwick in 1992. We believe Dr. Patel is qualified to serve on our Board due to his extensive leadership experience and knowledge of our Company based on his role as our Chief Executive Officer.

**Defendant Hill**

24.     Defendant Hill has served as CFO of the Company since September 2023.

25.      During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hill made the following sale of Company stock:

| DATE | NUMBER OF SHARES SOLD | PRICE PER SHARE($) | PROCEEDS ($) |
|---|---|---|---|
| May 20, 2025 | 2,535 | $8.05 | $20,406 |

Thus, in total, before the fraud was exposed, she sold 2,535 shares of Company stock on inside information, for which she received approximately $20,406 in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

26.     The 2025 Proxy Statement stated the following about Defendant Hill:

Emily Hill was appointed to be our Chief Financial Officer in September 2023. Before joining Replimune, Ms. Hill served as the Chief Financial Officer of PTC Therapeutics, Inc. since June 2019, and previously held various positions of increasing responsibility at PTC Therapeutics, Inc. since 2013. Previously, Ms. Hill was Director of Investor Relations at Warner Chilcott, Senior Manager of Investor Relations at Genzyme Corporation, and Biotech Equity Research Associate at Summer Street Partners. Ms. Hill obtained her M.B.A. with a concentration in Finance from Fordham University in 2011, her M.S. in Pharmacology from Tufts University School of Biomedical Research in 2006, and her B.A. in Chinese and

Biology from Hamilton College in 2002.

**Defendant Astley-Sparke**

27.     Defendant Astley-Sparke co-founded the Company and has served as a Company director since 2015, serving as Executive Chairman since April 2024, while having also served as Executive Chairman from 2015 until January 2020. Previously, Defendant Astley-Sparke served as the Company's CEO from January 2020 until April 2024.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Astley-Sparke made the following sale of Company stock:

| DATE | NUMBER OF SHARES SOLD | PRICE PER SHARE($) | PROCEEDS ($) |
|------|----------------------|--------------------|--------------|
| May 20, 2025 | 32,279 | $8.06 | $260,168 |

Thus, in total, before the fraud was exposed, he sold 32,279 shares of Company stock on inside information, for which he received approximately $260,168 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.     The 2025 Proxy Statement stated the following about Defendant Astley-Sparke:

Mr. Philip Astley-Sparke is one of our co-founders and has served as a member of our Board since our formation in 2015 and as our Executive Chairman since April 2024. Previously, Mr. Astley-Sparke served as our Chief Executive Officer from January 2020 to April 2024 and our Executive Chairman from our formation in 2015 to January 2020. Mr. Astley-Sparke currently serves on the board of directors of enGene Holdings Inc., a Nasdaq-listed immunotherapy company since July 2025. From 2016 until June 2021, Mr. Astley-Sparke served as Chairman of uniQure N.V., a Nasdaq-listed gene therapy company. From 2013 to 2015, Mr. Astley-Sparke served as uniQure N.V.'s President of U.S. operations, where he established its U.S. infrastructure. Mr. Astley-Sparke served as Vice President and General Manager at Amgen, Inc. until December 2011, following Amgen Inc.'s acquisition of BioVex Group, Inc. in March 2011. Mr. Astley-Sparke was previously President and Chief Executive Officer of BioVex Group, Inc. Prior to

BioVex Group, Inc., Mr. Astley-Sparke was a healthcare investment banker at Chase H&Q and qualified as a Chartered Accountant with Arthur Andersen LLP. Mr. Astley-Sparke has been a Venture Partner at Forbion Capital Partners, a venture capital fund, since May 2012 and previously served as Chairman of the board of directors of Oxyrane Limited, a biotechnology company, from 2012 to 2020. From 2021 to 2023, Mr. Astley-Sparke served on the board of Forbion European Acquisition Corp. Mr. Astley-Sparke received a B.Sc. in Cellular and Molecular Pathology from Bristol University. We believe Mr. Astley-Sparke is qualified to serve on our Board because of his extensive knowledge of our Company based on his role as co-founder and his prior role as our Chief Executive Officer and his extensive financial and leadership experience.

**Defendant Balachandran**

30.     Defendant Balachandran has served as a Company director since September 2024

and also serves as a member of the Research & Development Committee.

31.     The 2025 Proxy Statement stated the following about Defendant Balachandran:

Mr. Madhavan Balachandran has been a member of our Board since September 2024. Mr. Balachandran was Chief Operating Officer of Nutcracker Therapeutics, a developer of mRNA therapeutics, from September 2020 to March 2022. Previously, Mr. Balachandran was Executive Vice President, Operations of Amgen Inc., a global biotechnology company, from August 2012 until July 2016 and retired as an Executive Vice President in January 2017. Mr. Balachandran joined Amgen in 1997 as Associate Director, Engineering. He became Director, Engineering in 1998, and, from 1999 to 2001, he held the position of Senior Director, Engineering and Operations Services before moving to the position of Vice President, Information Systems from 2001 to 2002. Thereafter, Mr. Balachandran was Vice President, Puerto Rico Operations from May 2002 to February 2007. From February 2007 to October 2007, Mr. Balachandran was Vice President, Site Operations, and from October 2007 to August 2012, he held the position of Senior Vice President, Manufacturing. Prior to his tenure at Amgen, Mr. Balachandran held leadership positions at Copley Pharmaceuticals, now a part of Teva Pharmaceuticals Industries Ltd., and Burroughs Wellcome Company, a predecessor before mergers of GlaxoSmithKline plc. Mr. Balachandran currently serves as a director of A2 Biotherapeutics, Inc., a private company, a director of INCOG BioPharma Services, Inc., a private company, a non-executive director of uniQure, N.V., a Nasdaq-listed life sciences company and as a director of Stevanato Group S.p.A, a NYSE-listed, public global provider of drug containment, drug delivery and diagnostic solutions to the biotechnology and life sciences industries. Mr. Balachandran previously served as a director of Catalent, Inc., a NYSE-listed biopharmaceutical company, from May 2017 to January 2024. Mr. Balachandran holds a M.S. in Chemical Engineering from The State University of New York at Buffalo, a B.A. in Chemical Engineering from the Indian Institute of Technology,

Bombay, and an M.B.A. from East Carolina University. We believe Mr. Balachandran is qualified to serve as a director due to his extensive experience in the biotechnology industry, particularly his expertise in commercial development.

**Defendant Dhingra**

32.    Defendant Dhingra has served as a Company director since 2017 and also serves as

the Chair of the Research & Development Committee and as a member of the Compensation

Committee.

33.    The 2025 Proxy Statement stated the following about Defendant Dhingra:

Dr. Kapil Dhingra has been a member of our Board since 2017. Dr. Dhingra currently serves as the Managing Member of KAPital Consulting, LLC, a healthcare consulting firm that he founded in 2008. Dr. Dhingra also currently serves on the boards of directors of CARGO Therapeutics Inc., a Nasdaq-listed biotechnology company since April 2024, LAVA Therapeutics B.V., where he has served as Chairman and as a non-executive director since January 2021, Black Diamond Therapeutics, Inc., a Nasdaq-listed precision oncology medicine company since January 2021, and Median Technologies Inc., since June 2017. Dr. Dhingra previously served as a member of the board of directors of Mariana Oncology, a privately held company until its acquisition by Novartis AG in May 2024 and Autolus Therapeutics plc from August 2014 to December 2023, Five Prime Therapeutics Inc., until its acquisition by Amgen, Inc., Micromet, Inc., until its acquisition by Amgen, Inc., Advanced Accelerator Applications S.A., until its acquisition by Novartis AG, and YM Biosciences Inc., until its acquisition by Gilead Sciences, Inc., each of which was a public company during Dr. Dhingra's service as a director. From 1999 to 2008, Dr. Dhingra worked at F. Hoffmann-La Roche & Co. where he served as Vice President, Head of the Oncology Disease Biology Leadership Team and Head of Oncology Clinical Development. From 2000 to 2008, he held a Clinical Affiliate appointment at Memorial Sloan Kettering Cancer Center. From 1996 to 1999, Dr. Dhingra worked at Eli Lilly & Co. where he served as Senior Clinical Research Physician. Dr. Dhingra also served as a Clinical Associate Professor of Medicine at the Indiana University School of Medicine from 1997 to 1999. Prior to Eli Lilly & Co., Dr. Dhingra was a member of the faculty of M.D. Anderson Cancer Center from 1989 to 1996. Dr. Dhingra received his M.B.B.S. from the All India Institute of Medical Sciences in New Delhi, India. He completed his residency in Internal Medicine at Lincoln Medical and Mental Health Center and New York Medical College and completed his fellowship in Hematology and Oncology at Emory University School of Medicine. We believe Dr. Dhingra is qualified to serve on our Board due to his significant experience as a healthcare consultant, his biotechnology company board experience, and his experience as a senior officer of F. Hoffmann-La Roche & Co.

and Eli Lilly & Co.

**Defendant Goller**

34.     Defendant Goller has served as a Company director since March 5, 2025 and also serves as a member of the Nominating and Corporate Governance Committee.

35.     The 2025 Proxy Statement stated the following about Defendant Goller:

Michael Goller has been a member of our Board since March 2025. Mr. Goller is currently a Partner at Baker Bros. Advisor LP ("Baker Brothers"). Prior to joining Baker Brothers in 2005, Mr. Goller was an Associate at JPMorgan Partners, LLC from 1999 to 2003. Previously, Mr. Goller served as an Investment Banker with Merrill Lynch and Co. from 1997 to 1999. Mr. Goller currently serves on the board of directors of DBV Technologies S.A., a publicly traded biopharmaceutical company since October 2015, BeiGene, Ltd., a Chinese publicly traded biotechnology company, and Terremoto Biosciences, Inc., a U.S. biotechnology company. Mr. Goller served on the board of directors of Levo Therapeutics, a biotechnology company, from August 2017 to February 2019. Mr. Goller received a B.S. in Molecular and Cell Biology from The Pennsylvania State University in May 1997 and a master's degree in both Biotechnology (School of Engineered and Applied Sciences) and Business Administration (Wharton School) from the University of Pennsylvania in May 2005. We believe that Mr. Goller is qualified to serve on our Board based on his financial and executive-level experience and knowledge of the life science industry.

**Defendant Oliger**

36.     Defendant Oliger has served as a Company director since 2021 and also serves as the Chair of the Compensation Committee and as a member of the Research & Development Committee.

37.     The 2025 Proxy Statement stated the following about Defendant Oliger:

Ms. Christy Oliger has been a member of our Board since 2021. Ms. Oliger currently serves on the board of directors of Karyopharm Therapeutics Inc., a Nasdaq-listed pharmaceutical company, LAVA Therapeutics, a Nasdaq-listed clinical-stage immuno-oncology company, Vera Therapeutics, Inc., a Nasdaq-listed biotechnology company, and Nuvalent, Inc., a Nasdaq-listed biopharmaceutical company, since August 2020, March 2023, April 2024, and June 2025, respectively. Previously, Ms. Oliger served as a member of the board of directors of Sierra Oncology, Inc., a late stage biopharmaceutical company from June 2021 until June 2022 when the company was acquired by GSK, Reata

Pharmaceuticals, Inc. from April 2021 until June 2023 when the company was acquired by Biogen, and Rayze from September 2023 until April 2024 when the company was acquired by BMS. Ms. Oliger was previously Senior Vice President of the Oncology Business Unit at Genentech, Inc., a biopharmaceutical company, responsible for all commercial activities in the U.S. Ms. Oliger spent two decades with Genentech from 2000 to 2020, holding a number of leadership roles including Senior Vice President, IMPACT Business Unit; Vice President, Pharma Portfolio Management; Vice President, Portfolio Planning and Vice President, Hematology Marketing and Sales. Prior to Genentech, Ms. Oliger held management positions at Schering-Plough. Ms. Oliger holds a B.A. in economics from the University of California at Santa Barbara. We believe that Ms. Oliger is qualified to serve on our Board due to her extensive experience in commercial and portfolio management roles at biopharmaceutical companies.

**Defendant Peeples-Dyer**

38.    Defendant Peeples-Dyer has served as a Company director since June 2023 and

also serves as a member of the Audit Committee and the Nominating and Corporate Governance

Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Peeples-Dyer:

Ms. Veleka Peeples-Dyer has been a member of our Board since June 2025. Ms. Peeples-Dyer has served as a strategic enterprise leader with over 25 years of experience in the life sciences industry serving as in-house counsel for leading biopharmaceutical companies and outside counsel to global life sciences clients through her partnerships at prominent life sciences law firms, including as the Chair of the North American Food and Drug practice and Co-Chair of the Global Regulatory Group at Baker McKenzie, a top ten global life sciences firm. Throughout her career in the life sciences industry, including executive appointments as Chief Legal Officer, Chief Compliance Officer and Corporate Secretary, Ms. Peeples-Dyer has provided business, legal and compliance advice and counsel on a wide variety of matters, including Food and Drug Administration regulatory, global compliance, business development, clinical trials, quality, manufacturing, commercialization and other corporate matters. Ms. Peeples-Dyer is currently on the Advisory Board of Syridex Bio, a life sciences impact investment firm dedicated to the acceleration of health equity through focusing on investing in therapies for diseases that disproportionately affect underserved populations and the Board for the Frederick Innovative Technology Center, Inc. Ms. Peeples-Dyer holds a B.A. in Political Science from Hampton University and a J.D. degree from the University of South Carolina School of Law. We believe Ms. Peeples-Dyer is qualified to serve on our Board because of her significant experience serving as a legal and strategic advisor to biopharmaceutical and life sciences companies and her extensive knowledge of the broad regulatory and healthcare compliance issues

facing such companies.

**Defendant Pucci**

40.     Defendant Pucci has served as a Company director since April 2020 and also serves as a member of the Nominating and Corporate Governance Committee and a member of the Research & Development Committee.

41.     The 2025 Proxy Statement stated the following about Defendant Pucci:

Mr. Paolo Pucci has been a member of our Board since April 2020. From 2008 until its acquisition by Merck & Co. in January 2020, Mr. Pucci served as the Chief Executive Officer of ArQule, Inc., a biopharmaceutical oncology and rare diseases company engaged in the research and development of targeted therapeutics. Before joining ArQule, Inc., Mr. Pucci worked at Bayer AG from 2001 to 2008, where he served in a number of leadership capacities, including President of the Oncology & Global Specialty Medicines Business Units, and was a member of the Bayer AG Pharmaceuticals Global Management Committee. Before Bayer AG, Mr. Pucci held positions of increasing responsibility with Eli Lilly & Co. from July 1991 to April 2001, culminating with his appointment as Managing Director, Eli Lilly Sweden AB. Mr. Pucci currently serves on the boards of directors of West Pharmaceuticals Services, Inc. and Merus N.V., each of which are publicly listed companies. Additionally, Mr. Pucci previously served as Chair of the Audit Committee of Merus N.V. He is also a director at the privately held company AION Healthspan and in January 2025, he was appointed as an independent Non-Executive Director to the board of Chiesi Farmaceutici, a privately held Italian biopharmaceutical group. Mr. Pucci previously served on the boards of directors of ArQule, Inc., Algeta ASA, until its acquisition by Bayer AG, Dyax Inc., until its acquisition by Shire plc, NewLink Genetics Inc. and Trillium Therapeutics, Inc., until its acquisition by Pfizer Inc. Mr. Pucci earned an M.S. in economics and accounting from Università degli Study di Napoli Federico II and an M.B.A. in marketing and finance from the University of Chicago. We believe Mr. Pucci is qualified to serve on our Board because of his extensive leadership experience and financial expertise, his experience serving on the boards of biotechnology companies and his experience in management roles at life sciences companies.

**Defendant Slattery**

42.     Defendant Slattery has served as a Company director since 2017 and also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

43.     The 2025 Proxy Statement stated the following about Defendant Slattery:

Mr. Joseph Slattery has been a member of our Board since 2017. He previously served as our lead independent director from March 2019 until March 31, 2020. Mr. Slattery served as Executive Vice President and Chief Financial Officer of Asensus Surgical, Inc. from October 2013 through December 2019. From 2010 to 2013, Mr. Slattery served as Executive Vice President and Chief Financial Officer at Baxano Surgical, Inc. Previously, from 1996 to 2007, Mr. Slattery served in various roles of increasing responsibility at Digene Corporation, including as Chief Financial Officer and Senior Vice President of Finance and Information Systems from 2006 to 2007. Mr. Slattery currently serves on the board of directors of CVRx Inc. since October 2008. Previously, he served as a director of Morphic Therapeutic, Inc., Omega Alpha SPAC, Baxano Surgical, Inc., Exosome Diagnostics, Inc. and Micromet, Inc. Mr. Slattery received a B.S. in Accounting from Bentley University and is a certified public accountant. We believe Mr. Slattery is qualified to serve on our Board based on his experience in public accounting and financial expertise.

### **Defendant Weinand**

44.     Defendant Weinand has served as a Company director since June 2018 and as the Lead Independent Director since April 2024. Defendant Weinand also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Previously, Defendant Weinand served as the Chairperson of the Board from April 2020 until April 2024.

45.     The 2025 Proxy Statement stated the following about Defendant Weinand:

Mr. Dieter Weinand has been a member of our Board since June 2018 and has served as the lead independent director of our Board since April 2024. Mr. Weinand was previously the Chairperson of the Board from April 2020 to April 2024. From November 2018 to March 2020, Mr. Weinand served as Executive Vice President, Primary Care of Sanofi S.A. He previously served as President and CEO, Pharmaceutical Division at Bayer AG from 2014 to 2018. From 2013 to 2014, Mr. Weinand was President, Global Commercialization at Otsuka Pharmaceutical Co., Ltd. and from 2010 to 2013 Mr. Weinand was President, Primary Care and Asia-Pacific Region at Pfizer Inc. From 2001 to 2010, Mr. Weinand served as President, Senior Vice President, and Vice President of Bristol-Myers Squibb Company. Prior to joining Bristol-Myers Squibb Company, Mr. Weinand was Senior Vice President at F.H. Faulding, Inc. from 2000 to 2001, Managing Director, Director, Vice President, and Senior Director at Warner-Lambert Company, which was acquired by Pfizer Inc. in 2000, during the period from 1994 to 2000, Vice President at Pharmos Corporation during 1994, and Director, Area Business Operations Coordinator, and International Product Manager at Lederle

International during the period from 1990 to 1994. Mr. Weinand currently serves on the board of directors of Reunion Neuroscience, Inc., a clinical stage pharmaceutical company and Coya Therapeutics, a NASDAQ-listed clinical-stage biotechnology company. Previously, Mr. Weinand was a member the board of directors of Bayer AG, from 2013 to 2014, and HealthPrize Technologies LLC, from 2014 to 2018. Mr. Weinand was a director and member of the compensation committee and chair of the audit committee of Filed Trip Health Ltd. from October 2019 to July 2022. Mr. Weinand received a M.S. in Pharmacology and Toxicology from Long Island University and a B.A. in Biology from Concordia College. We believe Mr. Weinand is qualified to serve on our Board because of his extensive leadership experience, his experience serving on the boards of biotechnology companies and his experience in management roles at life sciences companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46.    By reason of their positions as officers and/or directors of Replimune and because of their ability to control the business and corporate affairs of Replimune, the Individual Defendants owed Replimune and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Replimune in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Replimune and its shareholders so as to benefit all shareholders equally.

47.    Each director and officer of the Company owes to Replimune and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Replimune, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

49.    To discharge their duties, the officers and directors of Replimune were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Replimune, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Replimune's Board at all relevant times.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

52.     To discharge their duties, the officers and directors of Replimune were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Replimune were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Replimune's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Replimune conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Replimune and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Replimune's operations would comply with all applicable laws and Replimune's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the

Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.    Each of the Individual Defendants further owed to Replimune and the shareholders the duty of loyalty requiring that each favor Replimune's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Replimune and were at all times acting within the course and scope of such agency.

55.    Because of their advisory, executive, managerial, and directorial positions with Replimune, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Replimune.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Replimune was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

60.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Replimune and was at all times acting within the course and scope of such agency.

## REPLIMUNE'S CODE OF CONDUCT

62.    The Company's code of Conduct notes that the Company has a commitment to "apply high ethical, moral and legal principles in every aspect of [the Company's] business conduct." The Code of Conduct also states that it applies to "each of the Company's employees, executive officers, directors and others acting on behalf of the Company."

63.    Regarding the purpose of the Code of Conduct, the Code of Conduct states:

[D]eter wrongdoing and promote the following:

• honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• full, fair, accurate, timely, objective, complete, relevant and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), the Food and Drug Administration or other regulatory and governmental agencies, and its stockholders, as well as in other public communications made by the Company;

• compliance with applicable governmental laws, rules and regulations;

• prompt internal reporting to an appropriate person or persons identified herein of violations of this Code; and

• strict accountability for adherence to this Code

64.    Regarding conflicts of interest, the Code of Conduct states, in relevant part:

A "conflict of interest" exists when a Company Party's private interest interferes in any way or appears to interfere in any way with the interests of the Company. A conflict of interest can arise when a Company Party acts or has interests that may make it difficult for him or her to objectively and effectively perform his or her work for the Company. Conflicts of interest also can arise when a Company Party, or members of his or her family, receives improper personal benefits because of his or her position in the Company, including without limitation loans or guarantees of obligations.

Transactions or relationships that constitute conflicts of interest are prohibited unless specifically approved by the Board or an appropriate committee of the Board.

65.    Regarding "Responsibility with Respect to Public Disclosures," the Code of Conduct states, in relevant part:

The Company is committed to providing full, fair, accurate, timely and understandable disclosure in its public communications and in the reports and documents that the Company files with regulatory authorities, including the SEC.

Strict laws apply to how the Company discloses information to its investors. These laws require the Company to make certain that any information it releases to the public about its business, preclinical and clinical results, financial condition or operating results is accurate and consistent. Strict compliance with both the spirit and the letter of the law governing public disclosures and reporting to the SEC is required. The Company's disclosures will enable its stockholders to understand (i) the key business opportunities we see, (ii) the issues and risks we manage, (iii) the critical accounting policies we employ and (iv) the important judgments we make in preparing our financial statements.

66. Regarding "Fair Dealing," the Code of Conduct states, in relevant part, that "[t]he Company seeks to outperform its competition fairly and honestly through superior performance and not through unethical or illegal business practices."

67. Regarding "Corporate Assets," the Code of Conduct states, in relevant part, that "Company Parties must endeavor to protect the Company's assets and property and ensure their efficient and proper use. Theft, carelessness and waste have a direct impact on the Company's profitability."

68. Regarding "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part, that "[a]ll Company Parties must respect and obey the laws, rules and regulations of the cities, states and countries in which the Company operates."

69. Regarding "Insider Trading," the Code of Conduct states, in relevant part, that "It is illegal and unethical to buy or sell securities, or tip others to trade, while in possession of material nonpublic information about that security (sometimes called "Inside Information") or to communicate such information to others who trade on the basis of such information (commonly known as "tipping")."

70. In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting aggregate proceeds of approximately $607,120. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## REPLIMUNE'S AUDIT COMMITTEE CHARTER

71.     Replimune also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee states that the purpose of the Audit Committee is to "assist the Board in overseeing the quality and integrity of the Company's financial statements, its compliance with legal and regulatory requirements, the performance of its internal audit function, if any, and the selection, appointment, qualifications, performance and independence of the registered public accounting firm."

72.     Regarding the Audit Committee's responsibilities of "Audits, Financial Statements and Earnings Releases," the Audit Committee Charter states:

• The Committee will discuss with the Company's registered public accounting firm the overall scope and plans for the annual audit.

The Committee will review and discuss with management and the Company's registered public accounting firm the audited financial statements (including Management's Discussion and Analysis contained therein) to be included in the Company's Annual Report on Form 10-K. The Committee also will discuss the results of the annual audit and any other matters required to be communicated to

the Committee by the Company's registered public accounting firm. Based on the foregoing and on review of other information made available to the Committee, the Committee will recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

• The Committee will review the interim financial statements with management and the Company's registered public accounting firm prior to the filing of each of the Company's Quarterly Reports on Form 10- Q. The Committee also will discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the Company's registered public accounting firm.

• The Committee will discuss with the registered public accounting firm any noted or proposed accounting adjustments, communications between the auditors and the audit firm's national office regarding auditing or accounting issues presented by the engagement and any proposed "management" or "internal control" letters.

• The Committee will discuss with the registered public accounting firm the matters required to be discussed under the standards of the PCAOB relating to the conduct of the audit including any difficulties encountered in the course of the audit work, including management's response to these difficulties, any restrictions on the scope of activities or access to requested information and any significant disagreements with management.

• The Committee will obtain from the registered public accounting firm assurance that Section 10A(b) of the Exchange Act (including auditor discovery that illegal acts may have occurred) has not been implicated.

• The Committee will review and discuss with the independent public accountants the matters required to be discussed by Auditing Standard No. 16, as adopted by the PCAOB and as amended from time to time.

• The Committee will review each other report of the Company's registered public accounting firm delivered to the Committee concerning: (i) all critical accounting policies and practices to be used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Company's registered public accounting firm; and (iii) other material written communications between the Company's registered public accounting firm and management, such as any management letter or schedule of unadjusted differences.

• The Committee will review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

73.    Regarding the Audit Committee's responsibilities of "Controls Over Financial

Reporting," the Audit Committee Charter states:

- The Committee will discuss with management, internal audit personnel, if any, and the Company's registered public accounting firm management's process for assessing the effectiveness of internal controls over financial reporting under Section 404 of the SarbanesOxley Act, if applicable, including any significant deficiencies or material weaknesses identified.

- The Committee will discuss with management its process for performing its required quarterly and annual certifications under Section 302 of the Sarbanes-Oxley Act.

- The Committee will discuss with management, internal audit personnel, if any, and the Company's registered public accounting firm any (i) changes in internal controls over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting that are required to be disclosed and (ii) other changes in internal controls over financial reporting that were considered for disclosure in the Company's periodic filings with the SEC.

- The Committee will discuss with the Company's registered public accounting firm the characterization of deficiencies in internal controls over financial reporting and any differences between management's assessment of the deficiencies and that of the Company's registered public accounting firm. The Committee will review the disclosures describing any identified material weaknesses and management's remediation plans.

74. Regarding the Audit Committee's responsibilities of "Compliance Matters," the

Audit Committee Charter states, in relevant part:

- The Committee will provide the Audit Committee report that the proxy rules of the SEC require be included in the Company's annual proxy statement.

- The Committee will report regularly to the Board to review any issues which arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, and the performance of the Company's internal audit function, if any.

- The Committee will review with senior management the Company's overall anti-fraud programs and controls.

- The Committee will establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by

Company employees of concerns regarding questionable accounting or auditing matters, and will monitor ongoing compliance with those procedures

• In the event the Committee is made aware of any allegation of fraud relating to the Company or any of its officers, directors or employees that the Committee deems could be material to the Company's business or operations, the Committee will (i) review such allegation and (ii) if the Committee deems it necessary or advisable, engage independent counsel to assist in an investigation.

* * *

• The Committee will at least annually review and discuss the Company's policies with respect to risk assessment and risk management. The Committee will meet regularly with officer(s) responsible for risk management with respect to operational, financial, strategic, compliance and reputational risks and report its findings to the Board.

75.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## REPLIMUNE'S RESEARCH & DEVELOPMENT COMMITTEE CHARTER

76.    Replimune also maintains a Research & Development Committee Charter (the "Research & Development Committee Charter") which governs the Research & Development Committee's roles and responsibilities. The Research & Development Committee Charter states that "[t]he Committee shall provide guidance to management and the Board with respect to the Company's research and development efforts and product pipeline, including providing input on

the Company's preclinical studies, clinical trials and clinical development risk."

77.    Regarding the Research & Development Committee's responsibilities, the Research & Development Committee Charter states:

• Meet with the Company's Chief Research & Development Officer and Chief Medical Officer at least three times per year to review the progress of the Company's research and development program and product pipeline.

• Assess each program's and product candidate's progress against its targets.

• Present to the Board a summary of all significant findings concerning the progress of the Company's research and development program and product pipeline as discussed at Research & Development Committee meetings.

• Request ad hoc meetings of the Research & Development Committee as necessary to discuss topics pertinent to the particular material research and development activities of the company as may be needed from time to time, or at the request of the Board.

• Engage, as the Committee may determine, in an annual self-assessment with the goal of continuing improvement, and annually review and reassess the adequacy of this charter and recommend any changes to the full Board.

• Perform any other activities consistent with this charter, the Company's certificate of incorporation and by-laws, each as may be amended from time to time and in effect, and applicable law, as the Committee or the Board deems appropriate.

78.    In violation of the Research & Development Committee Charter, the Individual Defendants failed to detect, prevent, or correct the deficiencies in the IGNYTE trial cited by the FDA in the CRL for the denial of the BLA for RP1. Specifically, the Research & Development Committee Defendants failed to detect, prevent, or correct that the IGNYTE trial was not an adequate and well-controlled clinical investigation that provided substantial evidence of the effectiveness of RP1, that the heterogeneity of the patient population prevented the FDA from adequately interpreting the trial, and there were "items related to the confirmatory trial study design which need[ed] to be addressed, including contribution of components."

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.    Replimune is a biotechnology company that represents itself to be "committed to applying our leading expertise in the field of oncolytic immunotherapy to transform the lives of cancer patients through our novel oncolytic immunotherapies." The Company largely focuses on developing immunotherapies to be utilized in the treatment of cancer through oncolytic immunotherapies, i.e. genetically engineered viruses designed to selectively target and kill tumor cells while stimulating the immune system to attack tumors.

80.    Replimune's lead treatment candidate is RP1, also known as vusolimogene oderparepvec. RP1's clinical trial is referred to as the IGNYTE Trial. The Company received a non-exclusive license to use the drug nivolumab from Bristol Myers Squibb for use in the IGNYTE Trial, to be utilized in conjunction with RP1 for the treatment of advanced melanoma.

81.    On November 21, 2024, the Company announced that it submitted a BLA with the FDA for the approval of using RP1, in conjunction with niolumab, as a treatment for melanoma.

### False and Misleading Statements

#### November 21, 2024 Press Release

82.    On November 21, 2024, the Company published the BLA Press Release, titled "Replimune Receives Breakthrough Therapy Designation for RP1 and Submits Biologics License Application to the FDA under the Accelerated Approval Pathway."

83.    The BLA Press Release stated, in relevant part:

[Replimune] today announced that it has submitted a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen. The submission was made under the Accelerated Approval pathway. The Company also announced that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting.

Breakthrough Therapy designation is intended to expedite the development and review of therapies for serious diseases *when preliminary clinical evidence indicates that the therapy may provide substantial improvement over existing available therapies* on one or more clinically significant endpoints. *This Breakthrough Therapy designation is based on the safety and clinical activity observed in the anti-PD1 failed melanoma cohort of the IGNYTE clinical trial*.

84.     The BLA Press Release also quoted Defendant Patel as stating that "[t]oday is an important milestone for Replimune and for the melanoma community *as we are one step closer to having another potential treatment available* for patients who have limited options after progressing on anti-PD1 containing regimens."

### *February 12, 2025 Form 10-Q*

85.     On February 12, 2025, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2025 Fiscal Year (the "Q3 2025 10-Q"). The Q3 2025 10-Q was signed by Defendants Patel and Hill and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Patel and Hill representing that the Q3 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

86.     Regarding the IGNYTE Trial and the status of the BLA, the Q3 2025 10-Q stated:

*Our leading clinical trial of RP1 is our IGNYTE trial*, a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. *The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma*. The anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140 patients who received RP1 plus nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the U.S.

Food and Drug Administration, or FDA. Responses from baseline were highly durable with 85% of responses lasting more than 12 months. The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. In September 2024, we presented the independently reviewed data from the IGNYTE clinical trial, including key secondary endpoints and subgroup analyses as a latebreaking abstract during an oral session at the European Society for Medical Oncology, or ESMO. Data presented at ESMO showed activity across all subgroups, including patients who had prior anti-PD1 and anti-CTLA-4 treatment had an ORR of 27.7% and patients who had primary resistance to anti-PD1 had an ORR of 35.9% by modified RECIST v1.1. In November 2024, we announced submission of a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the Accelerated Approval pathway. We recently announced the FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act goal date of July 22, 2025.

### *May 22, 2025 Form 10-K*

87.     On May 22, 2025, the Company filed its annual report on Form 10-K with the SEC, reporting Replimune's financial and operating results for the fourth quarter and full 2025 Fiscal Year (the "2025 10-K"). The 2025 10-K was signed by Defendants Patel, Hill, Astely-Sparke, Dhingra, Balachandran, Oliger, Pucci, Slattery, Peeples-Dyer, Weinand, and Goller and contained SOX certifications signed by Defendants Patel and Hill representing that that the 2025 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

88.     Regarding the status of the BLA, the 2025 10-K stated the following:

*Our leading clinical trial of RP1 [or vusolimogene oderparapvec] is referred to as the IGNYTE trial*, which is a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a nonexclusive, royalty-free license to, *and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1.*

The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma. The anti-PD-1 failed melanoma cohort from the IGNYTE trial includes 140 patients who received RP1 in combination with nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the FDA. ***Responses from baseline were highly durable with 85% of responses lasting more than 12 months***. The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. In September 2024, we presented the independently reviewed data from the IGNYTE trial, including key secondary endpoints and subgroup analysis as a late-breaking abstract during an oral session at the European Society for Medical Oncology, or ESMO. Data presented at ESMO showed activity across all subgroups, including patients who had prior anti-PD-1 and anti-CTLA-4 treatment had an ORR of 27.7% and patients who had primary resistance to anti-PD-1 had an ORR of 35.9% by modified RECIST v1.1. In November 2024, we presented a late-breaking abstract featuring the IGNYTE trial primary analysis that had been selected for oral presentation at the 39th Annual Meeting of the Society for Immunotherapy of Cancer (SITC 2024). The data presented at SITC 2024 included further clinical subgroup and initial biomarker data from the IGNYTE trial.

***In November 2024, we announced submission of a biologics license application, or BLA, to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma*** who have previously received an anti-PD-1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the accelerated approval pathway. ***The FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act, or PDUFA, goal date of July 22, 2025. The FDA recently completed their late-cycle review meeting and all manufacturing inspections for the BLA and we believe we remain on track for the July 22, 2025 PDUFA date***.

***May 22, 2025 Earnings Call***

89.     That same day, the Company hosted an earnings call with investors and analysts to

discuss the fourth quarter and year-end results (the "FY 2025 Earnings Call").

90.     During the FY 2025 Earnings Call, the Individual Defendants were asked about

impacts as the result of regulatory changes as well as the IGNYTE Trial, to which Defendants Hill

and Patel responded:

*Analyst*: Hi, guys. Good morning. Thanks for taking the questions. Congrats on the progress and for hosting what I believe is your first earnings call. First question, can you discuss the impact you're seeing from the recent regulatory changes and provide any color on recent FDA interactions?

And then on second question on [IGNYTE], can you discuss the translation of response rate into metrics like PFS and OS? And what benchmarks are you pointing to for PFS and OS in the anti-PD1 field melanoma setting? Thank you.

*Defendant Hill*: Thanks, Jonathan. This is Emily. I'll take the first segment of your question. So just as a reminder for those on the call, we received breakthrough through designation late last year and then submitted our BLA for RP1 and PD1 failed melanoma. Our BLA was accepted in January with a priority review. ***And since that 6 January, we've been responding to information requests from the FDA in a timely and thorough manner***.

We're very grateful to have seen committed and consistent engagement from our review team, and we haven't seen any changes to the cadence of that commitment. Having recently completed both our late-cycle meeting with the FDA and our manufacturing inspections. ***We're very pleased with the outcome of those interactions, and we believe there are no impediments. We're on track for our July 22 PDIFA***.

*Defendant Patel*: And Jonathan, just to address your second question. And yes, you're right, it's the first call, which we're very excited about. So, in terms of the data that we've seen for IGNYTE, just as a reminder, we've seen around patient 1/3 of patients achieved durable responses, which you look at median duration response of more than 20 months. This is a single-arm study, as you're aware. And so obviously, there are some limitations of PFS and OS in this study. ***However, we've seen a PFS of around 4 months and the overall survival, which I think is actually very impressive***, where we've seen more than about 55% of patients still alive at 3 years. And so, we think that's going to be very meaningful relative to other options in this space.

You asked about the benchmarks we should be using. ***And I think it is important to remember that the IGNYTE did use a very strict criteria for anti-PD1 failure***, and there is an exact apples-to-apples comparisons. But if you think about some of the other studies and assets or molecules used in this space, such as ipi/nivo or Opteolag having failed either ipi/nivo or Opteolag in the frontline setting, you see about a 12% response rate. And typically, physicians and KOLs will tell you would not expect to see median overall survival of more than 12 months.

So, I think that's a reasonable benchmark that most people use. Further checkpoint inhibition after failure of prior checkpoint inhibition really only results in a

response rate of 6% or 7% with very modest overall survival benefits.

91.    In response to a question regarding enrollment in the INGYTE3 trial and expectations on RP1's label, Defendant Patel stated:

> *Analyst*: Good morning. Thanks, guys, for taking my question. Just on the confirmatory IGNYTE3 trial, I think you initiated dosing of patients last summer. So, could you just talk to your experience to date with that trial and what you're seeing in terms of enrollment, opening of trial sites and things like that. And just expectations on a time line for completing enrollment. Any color there would be helpful.
>
> And second, could you talk to your expectations on the potential label or label discussions for RP1? And just what gives you confidence in a broad label and achieving broad access? Thank you.
>
> *Defendant Patel*: **So, just in terms of IGNYTE** or IGNYTE3, just as a reminder for people, **this is a large randomized study**[,] a confirmatory Phase III trial with 400 patients where we're combining RP1 with nivolumab versus limited dealers' choice, which includes [indiscernible], chemotherapy or single-agent checkpoint inhibition. **This is a trial that's going to have more than 100 sites globally. And as you can imagine, we've been providing the agency the updates on the timelines for the overall study and enrollment updates on a regular basis**.
>
> **We expect the trial to take a couple of years to complete enrollment given the study population and size of the study**. But -- and as you can imagine, right now, **we're intentionally focusing on enrolling in U.S. sites given the upcoming PDUFA, and when we realize that at approval patients will not want to be randomized into the control arm**. So, given that we're really focusing our efforts and driving enrollment in the U.S., it's going very well. There's a lot of excitement around the trial. And what we're actually now doing is spending a lot of time on the rest of world expansion.
>
> So, at PDUFA, we would continue to see enrollment in that study in countries such as The U.K, Australia and Europe. And again, there's equally high-level excitement from ex U.S. Investigators around the trial. We look forward to speaking to many of them at the upcoming ASCO meeting. And then you asked the second question, I believe, on the broad label. Is that correct?
>
> *Analyst*: Yes.
>
> *Defendant Patel*: . . . Just as a reminder, **IGNYTE, we enrolled a real-world population, which included really pretty much every type of anti PD1 felt presentation. We saw consistent benefit across all the subgroups**.

So, we would expect the label and as you know, now that we finished the late cycle meeting, we'll be going into labeling discussions to very much reflect the study population that we investigated in the INITRAL and would expect a label to reflect that broad population.

92.    The statements referenced in ¶¶ 82-91 were materially false and misleading and/or failed to disclose, *inter alia*, that: (1) the IGNYTE Trial was not a properly-controlled study; (2) the Individual Defendants were aware of, or should have been aware of, the material issues with the IGNYTE Trial's control; (3) therefore, the IGNYTE Trial's prospects were severely overstated; and (4) as a result of the foregoing, the clinical prospects for RP1 were overstated, giving way to a high likelihood that the FDA would not approve the BLA. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

### July 22, 2025 Press Release

93.    The truth emerged on July 22, 2025, when, before the market opened, the Company issued the Response Press Release, titled "Replimune Receives Complete Response Letter from FDA for RP1 Biologics License Application for the Treatment of Advanced Melanoma."

94.    The Response Press Release revealed that the FDA would not be approving the FDA as a result of issues with the IGNYTE Trial. The Response Press Release stated:

[Replimune], a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced that the U.S. Food and Drug Administration (FDA) has issued a Complete Response Letter (CRL) regarding the Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of advanced melanoma.

***The CRL indicates that the FDA is unable to approve the application in its present form**. The FDA has indicated **that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness**. Furthermore, the FDA said the trial cannot be adequately interpreted due to the heterogeneity of the patient population. **The**

*CRL also states that there are items related to the confirmatory trial study design which need to be addressed, including contribution of components. Importantly, no safety issues were raised*.

The Company will request a Type A meeting *and expects it will be granted within 30 days*. Replimune plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of RP1 without which the development of RP1 for advanced cancer patients with limited options will not be viable.

95.     On this news, the price per share of the Company's common stock fell $9.52, or 77.2%, from a closing price of $12.32 per share on July 21, 2025, to close at a price of $2.81 per share on July 22, 2025.

## DAMAGES TO REPLIMUNE

96.     As a direct and proximate result of the Individual Defendants' conduct, Replimune has lost and expended, and will continue to lose and expend, many millions of dollars.

97.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

99.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

100.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached

their fiduciary duties to the Company.

101.    As a direct and proximate result of the Individual Defendants' conduct, Replimune has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

102.    Plaintiff brings this action derivatively and for the benefit of Replimune to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Replimune, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

103.    Replimune is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104.    Plaintiff is, and has been at all relevant times, a shareholder of Replimune. Plaintiff will adequately and fairly represent the interests of Replimune in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

105.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

106.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Patel, Astley-

Sparke, Balachandran, Dhingra, Goller, Oliger, Peeples-Dyer, Pucci, Slattery, and Weinand (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants who are on the Board at the time this action is commenced.

107.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

108.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Replimune to issue materially false and misleading statements. Specifically, the Director-Defendants caused Replimune to issue false and misleading statements which were intended to make Replimune appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

109.    Additional reasons that demand on Defendant Patel is futile follow. Defendant Patel has served as the Company's CEO and as a Company director since April 2024. Defendant Patel previously served the Company in various roles starting in May 2021, most recently serving as the Company's Chief Strategy Officer from January 2023 until taking over as CEO in April 2024. The

Company provides Defendant Patel with his principal occupation. Thus, as the Company admits, he is not independent. In addition, Defendant Patel signed the false and misleading Q3 2025 10-Q and 2025 10-K (and the SOX certifications contained therein). As a Company director and the Company's highest officer, Defendant Patel is personally responsible for all of the false and misleading statements alleged herein, including those which he personally made. He conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. Defendant Patel is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Patel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Astley-Sparke is futile to follow. Defendant Astley-Sparke co-founded the Company and has served as a Company director since 2015, serving as Executive Chairman since April 2024, while having also served as Executive Chairman from 2015 until January 2020. Previously, Defendant Astley-Sparke served as the Company's CEO from January 2020 until April 2024. Thus, as the Company admits, Defendant Astley-Sparke is not independent. Defendant Astley-Sparke received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Astley-Sparke signed the false and misleading 2025 10-K. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. For these reasons, too, Defendant Astley-Sparke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Balachandran is futile to follow. Defendant Balachandran has served as a Company director since September 2024 and also serves as a member of the Research & Development Committee. Defendant Balachandran received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Balachandran signed the false and misleading 2025 10-K. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Balachandran breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Dhingra is futile follow. Defendant Dhingra has served as a Company director since 2017 and also serves as the Chair of the Research & Development Committee and as a member of the Compensation Committee. Defendant Dhingra received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Dhingra signed the false and misleading 2025 10-K. As a trusted-long time

Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Dhingra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Goller is futile to follow. Defendant Goller has served as a Company director since March 5, 2025 and also serves as a member of the Nominating and Corporate Governance Committee. Defendant Goller received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Goller signed the false and misleading 2025 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Goller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Oliger is futile to follow. Defendant Oliger has served as a Company director since 2021 and also serves as the Chair of the Compensation Committee and as a member of the Research & Development Committee. Defendant Oliger received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Oliger signed the false and misleading 2025 10-K. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's

engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Oliger breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant Peeples-Dyer is futile follow. Defendant Peeples-Dyer has served as a Company director since June 2023 and also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Peeples-Dyer received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Peeples-Dyer signed the false and misleading 2025 10-K. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Peeples-Dyer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

116.    Additional reasons that demand on Defendant Pucci is futile follow. Defendant Pucci has served as a Company director since April 2020 and also serves as a member of the Nominating and Corporate Governance Committee and a member of the Research & Development Committee. Defendant Pucci received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Pucci signed the false and misleading 2025 10-K. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Pucci breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Slattery is futile follow. Defendant Slattery has served as a Company director since 2017 and also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Slattery received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Slattery signed the false and misleading 2025 10-K. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Slattery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Weinand is futile follow. Defendant Weinand has served as a Company director since June 2018 and as the Lead Independent Director since April 2024. Defendant Weinand also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Previously, Defendant Weinand served as the Chairperson of the Board from April 2020 until April 2024. Defendant Weinand received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Weinand signed the false and misleading 2025 10-K. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the

scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Weinand breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on the Board is futile follow.

120.    Defendants Slattery (as Chair), Peeples-Dyer, and Weinand (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

121.    Defendants Dhingra (as Chair), Balachandran, Oliger, and Pucci (the "Research & Development Committee Defendants") served as members of the Research & Development Committee at all relevant times. As such, they were responsible for, *inter alia*, providing guidance and input to the Board and management "on the Company's . . . clinical trials and clinical development risk"; "[a]ssess[ing] each program's and product candidate's progress against its

targets"; and "[p]resent[ing] to the Board a summary of all significant findings concerning the progress of the Company's research and development program and product pipeline as discussed at Research & Development Committee meetings." Throughout the Relevant Period, however, the Research & Development Committee Defendants breached the Research & Development Committee Charter, as well as their fiduciary duties, by failing to detect, prevent, or correct the deficiencies in the IGNYTE trial cited by the FDA in the CRL for the denial of the BLA for RP1. Specifically, the Research & Development Committee Defendants failed to detect, prevent, or correct that the IGNYTE trial was not an adequate and well-controlled clinical investigation that provided substantial evidence of the effectiveness of RP1, that the heterogeneity of the patient population prevented the FDA from adequately interpreting the trial, and there were "items related to the confirmatory trial study design which need[ed] to be addressed, including contribution of components." Thus, the Research & Development Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

122.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

123.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of

corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

124.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

125.    The acts complained of herein constitute violations of fiduciary duties owed by Replimune's officers and directors, and these acts are incapable of ratification.

126.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Replimune. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Replimune, there would be no directors' and officers'

insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

127.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Replimune to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

128.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

129.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Replimune's business and affairs.

131.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

132.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Replimune.

133.    In breach of their fiduciary duties owed to Replimune, the Individual Defendants

willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the IGNYTE Trial was not a properly-controlled study; (2) the Individual Defendants were aware of, or should have been aware of, the material issues with the IGNYTE Trial's control; (3) therefore, the IGNYTE Trial's prospects were severely overstated; and (4) as a result of the foregoing, the clinical prospects for RP1 were overstated, giving way to a high likelihood that the FDA would not approve the BLA. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

134.    Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, three of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of approximately $607,120.

135.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

136.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

137.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

138.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Replimune's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

139.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Replimune has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff, on behalf of Replimune, has no adequate remedy at law.

<u>**SECOND CLAIM**</u>
**Against the Individual Defendants for Unjust Enrichment**

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Replimune.

144.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Replimune that was tied to the performance or artificially inflated valuation of Replimune or received compensation that was

unjust in light of the Individual Defendants' bad faith conduct.

145.    Plaintiff, as a shareholder and a representative of Replimune, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

146.    Plaintiff, on behalf of Replimune, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Replimune to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

149.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

150.    Plaintiff, on behalf of Replimune, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

151.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Replimune in a manner consistent with the operations of a publicly held corporation.

153.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Replimune has sustained and will continue to sustain significant damages.

154.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf of Replimune, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Replimune, for which they are legally responsible.

158.    As a direct and proximate result of the Individual Defendants' abuse of control, Replimune has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

159.    Plaintiff, on behalf of Replimune, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Patel and Hill for Contribution Under Sections 10(b) and 21D of the Exchange Act

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Replimune and Defendants Patel and Hill are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Patel's and Hill's willful and/or reckless violations of their obligations as officers and/or directors of Replimune.

162.    Defendants Patel and Hill, because of their positions of control and authority as officers and/or directors of Replimune, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Replimune, including the wrongful acts complained of herein and in the Securities Class Action.

163.    Accordingly, Defendants Patel and Hill are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

164.    As such, Replimune is entitled to receive all appropriate contribution or indemnification from Defendants Patel and Hill.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Replimune, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Replimune;

(c)    Determining and awarding to Replimune the damages sustained by it as a

result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Replimune and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Replimune and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Replimune to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Replimune restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 8, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
         tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Niels Vochten, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8__ day of September, 2025.



Niels Vochten